MORGAN, LEWIS & BOCKIUS LLP
BARBARA J. MILLER (SBN 167223)
JENNIFER L. BRADFORD (SBN 203871)
5 Park Plaza, Suite 1750
Irvine, CA  92614
Tel:    949.399.7000
Fax:    949.399.7001
E-mail:   barbara.miller@morganlewis.com
            jbradford@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
CHRISTOPHER A. PARLO, *Pro Hac Vice*
101 Park Avenue
New York, NY  10178-0600
Tel: 212.309.6000
Fax:  212.309.6001
E-mail:cparlo@morganlewis.com

Attorneys for Defendant
NORTHWESTERN MUTUAL LIFE INSURANCE
COMPANY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOLA LINT, NORMA WADDELL, AND DAVID YANG, on behalf of themselves individually and all others similarly situated,<br><br>          Plaintiffs,<br><br>      vs.<br><br>NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,<br><br>          Defendant. | Case No. 09 CV 1373 DMS (RBB)<br><br>**DEFENDANT NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF DAVID YANG**<br><br>Date:         September 17, 2010<br>Time:        1:30 p.m.<br>Courtroom:   10<br><br>Complaint Filed:   June 25, 2009<br>Trial Date:      None Set |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

**TABLE OF CONTENTS**

**Page**

I.    SUMMARY OF ARGUMENT ................................................................ 1

II.   SUMMARY OF UNCONTROVERTED FACTS............................................ 3

    A.    Background Information Regarding Northwestern Mutual .................... 3

    B.    Yang's Contract to Sell Northwestern Mutual Products........................ 3

    C.    Yang Was an Insurance Salesman ...................................................... 4

    D.    Yang Was Paid By Commission .......................................................... 5

    E.    100% of Yang's Time and Effort Was Devoted to Sales....................... 6

    F.    Yang Chose the Product He Wanted to Sell and the Audience ............. 7

    G.    Yang Customarily and Regularly Worked Outside of the Office ........... 8

    H.    Yang Treated Himself as a Full Time Life Insurance Salesman and Took Full Advantage of That Status on His Tax Returns .............................. 10

III.   PROCEDURAL BACKGROUND .......................................................... 11

IV.   LEGAL STANDARD ......................................................................... 12

V.    LEGAL ARGUMENT ....................................................................... 12

    A.    Yang's Claim Under the FLSA Fails As a Matter of Law Because He Qualifies for the Outside Sales Exemption ......................................... 12

        1.    Courts and the DOL Have Held That Insurance Agents Like Yang Are Outside Salespeople ..................................................... 13

        2.    Uncontroverted Facts Establish That Yang's Primary Duty Was the Sale of Life Insurance ...................................................... 17

        3.    Uncontroverted Facts Establish That Yang Was Customarily and Regularly Engaged Away from the Office Selling Life Insurance .......... 22

VI.   CONCLUSION ................................................................................ 24

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2

i

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

1

## TABLE OF AUTHORITIES

2

Page

3

**Cases**

4

*Ackerman v. Coca-Cola Enter., Inc.*
    179 F.3d 1260 (10th Cir. 1999)......................................................................... 21, 22

5

*Addisu v. Fred Meyer, Inc.,*
    198 F.3d 1130 (9th Cir. 2000) .......................................................................... 12

6

*American Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*
    2010 U.S. Dist. LEXIS 6617 (E.D.N.Y. Jan. 27, 2010) ......................................... 11

7

8

*Amtrust, Inc. v. Larson*
    388 F. 3d 594 (8th Cir. 2004)........................................................................... 11

9

10

*Baum v. Astrazeneca LP*
    605 F. Supp. 2d 669 (W.D. Pa. 2009) ................................................................ 13

11

*Bogan v. Northwestern Mutual Life Ins. Co.*
    606 N.Y.S.2d 775 (1994) ................................................................................ 13

12

13

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)....................................................................................... 12

14

*Chenensky v. New York Life Ins. Co.*
    2009 WL 4975237 (S.D.N.Y. Dec. 22, 2009) ................................................. passim

15

16

*Clausman v. Nortel Networks, Inc.*
    2003 U.S. Dist. LEXIS 11501 (S.D. Ind. May 1, 2003) ......................................... 22

17

*Fairbank v. Wunderman Cato Johnson*
    212 F.3d 528 (9th Cir. 2000).......................................................................... 12

18

*Fields v. AOL Time Warner, Inc.*
    261 F. Supp. 2d 971 (W.D. Tenn. 2003)......................................................... 19, 20

19

20

*Gregory v. First Title of Am., Inc.*
    555 F.3d 1300 (11th Cir. 2009)....................................................................... 17

21

*Hodgson v. Krispy Kreme Doughnut Co.*
    346 F. Supp. 1102 (M.D.N.C. 1972)............................................................. 17, 20

22

23

*Holden v. Northwestern Mutual Financial Network*
    2009 U.S. Dist. LEXIS 15321 (E.D. Wis. 2009) ............................................. 13, 18

24

*In re Novartis Wage & Hour Litig.*
    593 F. Supp. 2d 637 (S.D.N.Y. 2009)............................................................... 19

25

26

*Jewel Tea Co. v. Williams*
    118 F.2d 202 (10th Cir. 1941)......................................................................... 23

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                    ii

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*MAI Sys. Corp. v. Peak Computer, Inc.*
  991 F.2d 511 (9th Cir. 1993)...................................................................... 12

4

*Meyer v. Insurance Co. of Am.*
  1998 WL 709854 (S.D.N.Y. Oct. 9, 1998) ............................................... 11

5

6

*Miller v. Fairchild Indus., Inc.*
  797 F.2d 727 (9th Cir. 1986)...................................................................... 12

7

*Nielsen v. Devry, Inc.*
  302 F. Supp. 2d 747 (W.D. Mich. 2003) ............................................ 19, 21

8

9

*Nixon v. Northwestern Mutual Life Ins. Co.*
  58 F. Supp. 2d 1269 (D. Kan. 1999) .......................................................... 13

10

*Olivo v. GMAC Mortgage Corp.*
  374 F. Supp 2d 545 (E.D. Mich. 2004).............................................. 19, 21

11

12

*Pierce v. Northwestern Mutual Life Ins. Co.*
  444 F. Supp. 1098 (D.S.C. 1978)............................................................... 13

13

*Schmidt v. Eagle Waste & Recycling, Inc.*
  598 F. Supp. 2d 928 (W.D. Wisc. 2009)............................................. 20, 22

14

15

*Sofranko v. Northwestern Mutual Life Ins. Co.*
  2008 WL 145509 (W.D. Pa. Jan. 14, 2008)............................................ 3, 12

16

*Weary v. Cochran & Northwestern Mutual Life Ins. Co.*
  377 F.3d 522 (6th Cir. 2004)...................................................................... 12

17

18

*Zemel v. Horowitz*
  2006 WL 516798 (N.Y. Sup. Ct. Mar. 2, 2006) ....................................... 11

19

**Statutes**

20

26 U.S.C. § 3121 ............................................................................................. 10

21

26 U.S.C. § 7701 ............................................................................................. 11

22

29 U.S.C. § 203 ............................................................................................... 17

23

29 U.S.C. § 207 ............................................................................................... 13

24

29 U.S.C. § 255 ............................................................................................... 11

25

29 C.F.R. § 541 ........................................................................................ passim

26

Fed. R. Civ. P. 56 ........................................................................................... 12

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Other Authorities**

DOL Opinion Letter FLSA 2009-28 ...................................................................... passim

DOL Opinion Letter FLSA 2007-2 ............................................................................ 22

Moore's Federal Practice § 56.11 .............................................................................. 12

U.S. Bureau of Labor Statistics, *Occupational Outlook Handbook* (2010-11 edition) ............... 17

1

2

3

4

5

6

7

8

9

10    "And sometimes, when I first started out, every Tuesdays and
       Thursdays, I'll see 40 -- 40 clients. And Monday and Wednesday,
11    I'll see 10. So, in one week, I'll see 50 clients. I'll put, like, 4,000
       miles in one month, versus some of the guys in the office, they
12    complain about they can't get an appointment. Well, if you can't
       get an appointment, you've got to -- you've got to get in the car and
13    go out there and find you somebody. That's what I done."

14        .

15
                           David Yang
16                         February, 2003

17

18            Defendant's Statement of Uncontroverted Facts ("UF") 9.

19

20

21

22

23

24

25

26

27

28

## I.        SUMMARY OF ARGUMENT

At all relevant times, Plaintiff David Yang ("Yang") was, and still is, a life insurance salesman.  He voluntarily entered into contracts with the offices of general agents James R. Worrell ("Worrell") in North Carolina, and later John H. Bullock ("Bullock") in Georgia, to sell life insurance and other products on a commission basis.  Every contract Yang signed expressly stated that he was an independent life insurance salesman; and, consistent with his contracts, Yang was treated by Worrell, Bullock, and Northwestern Mutual Life Insurance Company ("Northwestern Mutual") as an independent life insurance salesman for tax and all other purposes.  During the period he was contracted to sell Northwestern Mutual products, Yang never once complained about being an independent outside salesman or asked to punch a time clock as a non-exempt employee in order to collect minimum wage or overtime.  Instead, he took significant advantage of his status as an independent contractor and outside salesman in every conceivable way.

After his contract to sell Northwestern Mutual products terminated, Yang filed this lawsuit, claiming for the first time that he was neither an independent contractor nor an outside salesman, and demanding entitlement to minimum wage and overtime pay under the Fair Labor Standards Act ("FLSA").  However, even if all factually supportable allegations advanced by Yang are accepted as true (for purposes of this Motion only), Yang's claims must be dismissed because the uncontroverted facts establish that Yang clearly falls within the FLSA's "outside sales" exemption and, therefore, he is exempt from the FLSA's minimum wage and overtime requirements.[1]

Yang's own deposition testimony establishes that his primary, and indeed only, duty while under contract with Worrell and Bullock was to sell insurance products, including, but not exclusively, products of Northwestern Mutual.  According to Yang, 20% of his time was spent outside the office consummating his insurance sales, and 80% of his time was spent prospecting

---

[1] Yang's claims also fail because his status as an independent contractor precludes recovery under the FLSA.  Northwestern Mutual does not move here for dismissal of Yang's claims on these grounds, and instead limits this Motion to one for summary judgment dismissing Yang's claims on the grounds that, even if he is assumed to be an employee for purposes of argument, his status as an outside salesman prevents any recovery under the FLSA.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                1                    Case No. 09 CV 1373 DMS (RBB)
                                                                   P&As ISO Motion for Summary Judgment

1   for additional sales.  He had no other non-sales duties.  There could not be a more quintessential

2   outside salesperson.

3        This is not a case where an employee has multiple job duties and the court must sort

4   through facts to assess which are "primary."  Yang concedes he had but one duty – to sell

5   insurance products.  He was recruited, engaged, and trained to sell.  He prospected for and

6   identified customers, approached those customers, solicited their business, and sold them

7   insurance products using his own unique and individual sales methods.  He set his own sales

8   appointments and determined which potential customers to call upon.  He was paid on a

9   commission basis.  He reported himself to state and Federal tax authorities and to other courts as

10  an independent contractor and as a salesman, and took advantage of significant tax and other

11  benefits because of his declared status.  Every possible indicium of outside sales as identified by

12  the United States Department of Labor ("DOL") is met here.  To the extent Yang tries to argue

13  that selling was not his primary duty, the absurdity of that argument is seen in just one simple fact

14  – the only way he ever could and did make money under his contracts with Worrell and Bullock

15  was if he sold insurance products.  If he sold no products he received no payments.

16       In addition, the undisputed facts, including those contained in the tax returns Yang filed

17  and in pleadings he filed in Bankruptcy Court, confirm that Yang was customarily and regularly

18  engaged in making his sales outside of his office, and, in fact, often in an entirely different state

19  from where he claimed his office was in North Carolina.

20       Every court that has been asked to review facts regarding insurance agents similar to Yang

21  has concluded that the agents qualified for the FLSA's outside sales exemption.  *See, e.g.,*

22  *Chenensky v. New York Life Ins. Co.*, 2009 WL 4975237 (S.D.N.Y. Dec. 22, 2009).  In addition,

23  the DOL concluded just last year that insurance agents performing the same duties which Yang

24  admits he performed clearly fall within the outside sales exemption.  *See* DOL Opinion Letter

25  FLSA 2009-28, pp.1-4 (Jan. 16, 2009) ("DOL Agent Letter").  Neither the DOL nor any court has

26  reached a contrary conclusion.  Accordingly, because Yang was an outside salesman, and thus

27  exempt from the minimum wage and overtime provisions of the FLSA, Northwestern Mutual is

28  entitled to summary judgment in its favor.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2

2

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

## II.     SUMMARY OF UNCONTROVERTED FACTS

### A.     Background Information Regarding Northwestern Mutual

Northwestern Mutual is a life insurance company headquartered in Milwaukee, Wisconsin.  *Sofranko v. Northwestern Mutual Life Ins. Co.*, 2008 WL 145509, at *3 (W.D. Pa. Jan. 14, 2008).  Its core business is underwriting, issuing, and servicing insurance policies (life, disability income, and long term care) and annuities.  UF 1.  Northwestern Mutual does not directly solicit prospective customers to apply for or purchase its insurance products.  *Sofranko*, 2008 WL 145509, at *3.  It does not hire any employees to sell its products, and it does not sell insurance from its home office or through direct marketing, bank affiliations, or the internet. Instead, for over 100 years, Northwestern Mutual has sold its products only through a network of independent insurance agents, who, like Yang, individually contract with general agents to sell Northwestern products.  *Id.*

The independent contractor sales force through which Northwestern Mutual products are sold begins with general agents, and ultimately extends to the thousands of independent sales agents who sell insurance to the public.  Northwestern Mutual enters into contracts directly with general agents located throughout the United States.  *Id.*  General agents contract for the right to solicit applications from customers for Northwestern Mutual products within a given territory and to sell them insurance.  General agents, in turn, may contract with District Agents and/or Field Directors to grow their own general agencies.  District Agents and Field Directors are licensed insurance agents, and engage in personal production (*i.e.*, insurance sales) and the recruitment and development of other agents for their own districts and the general agency.  District Agents and Field Directors, in turn, may contract directly with Financial Representatives ("FRs" or "Agents") like Yang.  *Id.*  The contracts that FRs sign with general agents, District Agents, or Field Directors all provide that these individuals are independent salespersons and not employees of either the general agent, District Agent, Field Director, or Northwestern Mutual.

### B.     Yang's Contract to Sell Northwestern Mutual Products

Yang was appointed to sell life insurance and other products of Northwestern Mutual from approximately August 2001 to January 2007.  UF 2.  Yang's first contract was with Worrell, a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                    3                    Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

1  Northwestern Mutual general agent in Charlotte, North Carolina.  UF 3.  Yang remained affiliated

2  with Worrell's office until Yang executed a secondary contract in the summer of 2006 to work

3  out of the office of Bullock, a general agent in Atlanta, Georgia.  UF 4, 5.  According to his tax

4  returns, Yang was a full-time resident of Georgia in 2005 and 2006.  UF 6.  Each of the contracts

5  Yang signed over the years confirmed the parties' understanding that Yang was an independent

6  sales agent, and not a non-exempt employee of Worrell, Bullock, or Northwestern Mutual.  UF

7  10.

8    **C.**     **Yang Was an Insurance Salesman**

9  Every position Yang had at any company prior to contracting with Worrell was a sales

10  position.  UF 11.  When Yang began his affiliation with Worrell, it was confirmed that he would

11  be selling.  UF 12 (Agent Application) ("Do you understand that a Full Time Agent's Contract

12  requires the Agent to devote full time selling for Northwestern Mutual?  ■ Yes"); UF 12

13  (Transcript of Northwestern Mutual 28th Southern Regional Meeting 2003) ("Basically, when I

14  came into this business, I knew I could sell . . . American people are easy to sell.") ("I'm in here

15  to sell life insurance for the people that need life insurance.").  Yang's status as a salesman

16  remained unchanged while he was under contract with Worrell and Bullock.  UF 13.

17  Yang focused almost exclusively on the sale of life insurance.  UF 14.  He did so for two

18  reasons.  First, despite repeated attempts, he could not pass the examinations required to become

19  a registered representative, which would have enabled him to sell securities-based products such

20  as variable annuities and mutual funds.  UF 15.  Second, Yang was uninspired by the lower

21  commissions to be earned on sales of other types of insurance.  UF 16.  In the first year he was

22  contracted with Worrell, Yang wrote over $200,000 in life insurance sales.  UF 18.  Yang

23  testified that, later, he went to Georgia to develop the Korean market there, and that he "opened

24  the market" for insurance sales in Georgia in July or August 2006.  UF 19.

25  As the quintessential independent outside salesperson, Yang was appointed to sell the

26  insurance products of multiple companies, not just Northwestern Mutual.  Indeed, while

27  simultaneously contracted to sell Northwestern Mutual insurance with Worrell and Bullock, Yang

28  was appointed to sell the insurance products of American General Life Insurance Company, Axa

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                    4                    Case No. 09 CV 1373 DMS (RBB)
                                                                        P&As ISO Motion for Summary Judgment

1    Equitable Life Insurance, John Hancock Life Insurance Company, Lincoln Benefit Life Insurance

2    Company, Sun Life Financial, and AIG.  UF 20.

3         In addition, after Bullock and Yang mutually terminated their contractual relationship,

4    Yang contracted to sell the insurance products of Massachusetts Mutual Life Insurance Company

5    ("MassMutual").  UF 21.  In his application to MassMutual, Yang listed his "Job Title" selling

6    Northwestern Mutual products as "Insurance Agent (Sales)" and the "Nature of [his] Business" as

7    "Insurance Sales."  UF 22 (Yang Form 1040 Schedule C listing his "Principal Business . . .

8    Sales"); *see also* UF 22 (Yang Bankruptcy Application, p. 6, listing "Nature of Business" as

9    "Commission based on Sales").[2]  As with Northwestern Mutual, Yang entered into a contract

10   with a MassMutual general agent that expressly confirms he is an independent contractor and not

11   an employee and that his role and duty in connection with that contract is the sale of life

12   insurance.  UF 23 ("I understand that once MassMutual endorses my Career Contract, I become

13   an independent contractor of the General Agent.  I do not become an employee of the General

14   Agent or of MassMutual or any of its affiliated companies."). Yang concedes he is an

15   independent contractor of MassMutual, that his primary duty at MassMutual is sales, and that he

16   is a MassMutual salesman.  UF 25-27.[3]  Yang further concedes that "[t]here's a lot that's similar"

17   with respect to his work selling MassMutual products and his work selling Northwestern Mutual

18   products.  UF 28.

19        **D.    Yang Was Paid By Commission**

20        The payments Yang received throughout all of 2005 and 2006 from Worrell and Bullock

21   were commissions and renewal commissions for his sale of life insurance.  UF 30.  Specifically,

22   Yang received a percentage of the first-year premium paid by customers for the insurance

23   product(s) that Yang sold them.  UF 31.  Yang did not receive a salary from Worrell, Bullock, or

24   Northwestern Mutual.  UF 33 (Complaint ¶ 15, stating that "Reps receive no base salary at all –

25   working exclusively on a commission basis").

26

27   [2] In his résumé Yang listed his work with Worrell and Bullock under "Professional Sales Experience."  UF 24.

28   [3] In a declaration he filed with this Court, Yang states that he "make[s] five to ten sales calls per day" at MassMutual.  UF 29.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

### E.   100% of Yang's Time and Effort Was Devoted to Sales

Putting aside Yang's binding admission in numerous documents he filed with tax authorities and the Bankruptcy Court that he was an insurance salesman, it is also undisputed that the duties Yang performed while contracted with Worrell and Bullock consisted of selling insurance and occasionally training others to sell insurance.  UF 34.  Indeed, Yang conceded that 100% of his time was spent arranging for and making sales – 20% of the time consummating the sales and 80% of his time prospecting for more sales.  UF 35.  Yang estimated that 10-20% of his time was spent meeting with clients or prospective clients outside of the office.  UF 36.  Yang estimated that the other 80% of his time was spent making calls in order to get more sales.  UF 37.  Yang concedes that his unique prospecting methods resulted in great initial sales success and that he saw "hundreds of people" in order to make his sales:

> Q.  When was the first time you were in Georgia meeting with a policyholder over a contract?
>
> A.  I have no idea.  There's no way I can remember that.  ***I see, you know, hundreds of people.***  There's no way – and I had been there almost six years. There is no way I'm going to remember.  I don't even remember all of my clients' names right now.
>
> ***I sold*** to Koreans, Japanese, Americans, African-Americans, Middle Eastern.  ***I sold them all.***  There is no way I can remember who, who my first, I don't even know who my first customer was with Northwestern, period.

UF 39 (emphasis added).

Yang testified that he was a "24/7 person" in that he would try to approach potential clients and make sales seven days a week, even on weekend visits to the grocery store.  UF 40. According to Yang, he would solicit sales "all the time."  UF 41.  In order to develop his own sales, Yang, by his own admission, spent his time:

- meeting with current and prospective clients (in and out of the office), UF 42;

- communicating with clients, UF 43;

- developing client leads by searching the Yellow Pages and the Internet, UF 44;

- setting up and attending promotional meetings with groups of targeted families, UF 45;

- cold calling prospects, UF 46;

- soliciting potential clients when not in the office, UF 47;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                    6

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

- attending meetings of targeted organizations on a regular basis, UF 48;
- calling past clients for referrals, UF 49;
- dropping-in on small businesses in order to converse with their owners, UF 50;
- involving himself in the local community, UF 51;
- delivering policies to clients, UF 52;
- playing rounds of golf with clients to develop business relationships, UF 53;
- making donations to targeted foundations to generate business leads, UF 54; and
- purchasing advertising, UF 55.

Yang met with up to 50 clients every week to sell insurance.  UF 56 ("Q. Did you meet with clients every week to sell insurance?  A. Absolutely.").  In weeks when Yang did not have many appointments, he spent his time on the phone and Internet, and in his car, trying to find new clients.  UF 57.  On weekends when he did not already have appointments Yang would create new sales opportunities.  UF 58 ("Well, if you can't get an appointment, you've got to -- you've got to get in the car and go out there and find you somebody.").  Yang conceded that he targeted various organizations within the community and would attend their meetings in order to develop business:

> Q.  And when the organizations you targeted had meetings would you go to the meetings?
> A.  Yes.
> Q.  And was that for the purpose of trying to get more clients, more sales?
> A.  Yes, building the relationship.
>                          * * *
> Q.  Every time they have a meeting, I'm there?
> A.  Yes, I'm there.

UF 59.  It cannot be credibly disputed that Yang devoted significant time to selling.

### F.   Yang Chose the Product He Wanted to Sell and the Audience

FRs who are appointed to sell Northwestern Mutual products, such as Yang, are free to choose whose products and what products they want to sell – they do not have to sell Northwestern Mutual life insurance products exclusively.  UF 60.  Yang opted to focus on selling life insurance, rather than on selling health insurance, because health insurance would generate a smaller commission per sale and he wanted the large commissions.  UF 61.  Unlike other

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                          7                          Case No. 09 CV 1373 DMS (RBB)
                                                                   P&As ISO Motion for Summary Judgment

1   insurance agents, who Yang believed were all targeting the same sales targets, Yang opted not to

2   target doctors, lawyers, or CEOs as his clientele.  UF 62.  Instead, Yang focused on small

3   business owners and contacts within the Korean community.  Later he targeted professional

4   athletes.  UF 63.

5        In addition to choosing the type of clients to pursue, Yang also took responsibility for

6   building his own client base.  Yang searched the Yellow Pages and Internet for his potential

7   clients, and would solicit his prospects outside of the office and after working hours.  UF 64.

8   Yang gave his personal cellular phone number and email address to current and potential clients,

9   and used his personal phone and email.  UF 65-67.  Yang even traveled outside of Worrell's

10  territory to sell life insurance, despite the fact that Worrell told him that he had to do it on his own

11  and incur his own expenses.  UF 68.  Yang chose to market and advertise his services and bore

12  part or all of the cost of such advertisement.  UF 69.

13       **G.      Yang Customarily and Regularly Worked Outside of the Office**

14       As mentioned above, Yang conceded that 10-20% percent of his time was spent meeting

15  with clients or prospective clients outside of the office.  UF 84.  As a "24/7 person" who made

16  sales "all the time," Yang solicited and made sales during his lunch break, after working hours,

17  and on weekends.  UF 85; UF 86 ("Q. Okay.  Did you meet with clients every week to sell

18  insurance?  A. Absolutely.").  Yang approached potential clients during routine out-of-office

19  activities such as grocery shopping.  UF 87.  On weekends, Yang made cold calls on companies

20  in order to find new business.  UF 46; UF 64; UF 85 ("Q. Okay.  So sometimes on the weekend

21  you were doing work soliciting sales?  A. All the time.").  Yang visited dry cleaners, convenience

22  stores, and florist shops to make sales.  UF 89.  According to Yang, he would research and find a

23  potential client and then just drop in on them at their business.  UF 90.  During the first visit he

24  would not even try to make a sale – he would just talk with them.  UF 91.  He would then go back

25  a second time, or even more, and then try to make a sale.  UF 91.  Yang would then personally

26  deliver the completed insurance policies to his customers.  UF 92.  All of this time was outside of

27  any office.

28       Yang's community involvement also regularly took him outside of the office.  Yang

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Irvine

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

1    would regularly attend meetings of targeted organizations whenever such meetings were held.

2    UF 93.  For example, Yang developed a relationship with a group of approximately 40 local

3    Asian business owners with whom he would meet twice a week when he first started selling

4    Northwestern Mutual products.  UF 94.  Yang would also set up informational and promotional

5    meetings with groups of families.  UF 95.

6        It is also undisputed that Yang engaged in considerable travel to generate business, visit

7    customers, and consummate sales.  Many of the current and prospective clients who Yang visited

8    lived many miles (sometimes hundreds of miles) from the office.  UF 96 (letter confirming four

9    days of Yang "sales appointments" in Atlanta, Georgia and Beauford, South Carolina in just two

10   weeks).  During the years he was contracted to Worrell, Yang put 4,000 miles on his car each

11   month, all of which were incurred in connection with his sales.  UF 97 ("A. Yeah I did drive a lot.

12   Q. Okay.  Going to see clients?  A. Yeah, because I went to Georgia and upper North Carolina.

13   Q. Out of the office right?  A. Out of the office.").  According to Yang, he even carried a printer

14   in his car so he could print insurance applications on the spot.  *See* Transcript of Northwestern

15   Mutual 28th Southern Regional Meeting 2003, at 14:9-18 (attached as Exhibit D to the

16   Declaration of Barbara J. Miller).  Some weeks, Yang would make two 500-mile drives within

17   Worrell's territory, as Worrell's territory required a 200-300 mile drive from one end to another,

18   and Yang sold everywhere within that territory.  UF 98; UF 99 ("Q. Did you sell everywhere

19   within Mr. Worrell's territory?  A. Yes.").  According to Yang's tax returns, in 2005 he incurred

20   $18,472 in car expenses from being on the road making sales calls.  UF 100.  In 2006 he incurred

21   $11,832 in car expenses for the same purpose.  UF 101.  While supposedly still working out of

22   Worrell's office in Charlotte, Yang had ten or fifteen clients in Georgia, and Yang would travel

23   from North Carolina to "sell to them and to prospect for other clients to sell to."  UF 102.  Yang

24   also had clients in South Carolina that he would visit to make sales and "to get referrals to sell

25   more business."  UF 103, 105.

26       During some months in 2005 and early 2006, Yang alleged he would split time between

27   Charlotte and Georgia.  UF 104.  However, according to Yang's tax returns and other documents,

28   including his Bankruptcy Court filings, Yang did not even live in the state (North Carolina) in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                    9                    Case No. 09 CV 1373 DMS (RBB)
                                                                        P&As ISO Motion for Summary Judgment

1  which he reported his office was based.  To the contrary, from October 1, 2004 through the end of

2  2006 Yang reported his home as being at 2599 Worrall Hill Way in Duluth, Georgia, where he

3  indicated he was a "Full-Year Resident."  UF 016.  He reported his office as being only in

4  Charlotte, North Carolina.  UF 107.[4]  As he claims that he made no/zero sales out of his office in

5  North Carolina, Yang reported "0" North Carolina source income and told the North Carolina

6  Department of Revenue that "Taxpayer and Spouse are full year residents of GA.  Neither

7  taxpayer or spouse lived in NC in 2006."  UF 109.  As Yang's office was not in the state in which

8  he reported he lived, and as all of his sales income was reported from Georgia, it is impossible for

9  Yang to show he was not out of the office in North Carolina making sales on at least a "greater

10  than occasional" basis.

11  **H.      Yang Treated Himself as a Full Time Life Insurance Salesman and Took Full
              Advantage of That Status on His Tax Returns**

12       Yang represented himself to the IRS as a full-time life insurance salesman and reaped the

13  benefits of this status each year on his tax returns.  For example, Yang declared that he was his

14  own business, which was involved in "sales" and based at 2599 Worrall Hill Way in Duluth,

15  Georgia.  UF 70.  He reported his commissions as business income which he derived from sales.

16  UF 71.  In 2005, Yang declared $36,230 in expense deductions in connection with his sales

17  business against $68,514 in gross sales.  UF 72.  In 2006, Yang declared $26,296 in expense

18  deductions in connection with his sales business against $41,011 in gross sales.  UF 73.  As a

19  result of his business expense deductions Yang substantially reduced the amount of taxes that he

20  had to pay, and, indeed, in 2006 he actually paid no taxes at all in North Carolina, the state in

21  which he now claims he maintained his office and spent all of his time.  UF 74.

22       In order to be able to deduct his business expenses on Schedule C, Yang had to, and did,

23  treat himself as a "statutory employee."  The statutory employee designation is a unique creation

24  of the Internal Revenue Code, which requires that individuals be independent contractors and

25  operate as a "full-time life insurance salesman."  26 U.S.C. § 3121(d) (permitting a "full-time life

26

27  ─────────────
[4] Asked repeatedly if he had a separate or second office in Georgia, Yang repeatedly testified "No."  UF
108 ("I never had my own office, no.").  Accordingly, Yang cannot now argue that he was working in an
office in that state.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                     10                    Case No. 09 CV 1373 DMS (RBB)
                                                                         P&As ISO Motion for Summary Judgment

1   insurance <u>salesman</u>" to elect statutory employee status) (emphasis added); 26 U.S.C. §

2   7701(a)(20) (same) (permitting a "full-time life insurance <u>salesman</u> . . .") (emphasis added); *see*

3   *also* Department of the Treasury, IRS, Employer's Supplemental Tax Guide, Publication 15-A

4   (2009).  By using a Schedule C every year, Yang confirmed each year that he was a statutory

5   employee and a full time life insurance salesman.  Courts consistently have held that a party is

6   estopped from adopting in a legal proceeding a position contrary to that previously asserted on his

7   tax returns.  *Amtrust, Inc. v. Larson*, 388 F. 3d 594, 601 (8th Cir. 2004) (quasi-estoppel stops

8   parties from asserting a position in judicial proceedings that is different from what was reported

9   in tax returns); *American Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 2010 U.S. Dist.

10  LEXIS 6617, at *45-*46 (E.D.N.Y. Jan. 27, 2010) (same) (collecting cases); *Zemel v. Horowitz*,

11  2006 WL 516798, at *6 (N.Y. Sup. Ct. Mar. 2, 2006); *Meyer v. Insurance Co. of Am.*, 1998 WL

12  709854, at *10 (S.D.N.Y. Oct. 9, 1998) (holding that plaintiff was bound by her sworn

13  representations in tax returns and was estopped from taking a position inconsistent with her

14  representations to the IRS).  Judicial estoppel forbids a party from "receiving the benefits of a

15  transaction or statute, and then subsequently taking an inconsistent position to avoid the

16  corresponding effects."  *Zemel*, 2006 WL 516798, at *5.  This Court should apply the same

17  principle here and declare that Yang is precluded now from claiming that his primary duty was

18  anything other than outside sales.

19  **III.   PROCEDURAL BACKGROUND**

20          After terminating his contract to sell Northwestern Mutual products, Yang, along with two

21  other named plaintiffs, filed this lawsuit on June 25, 2009, claiming for the first time that they

22  were non-exempt employees of Northwestern Mutual during the time they had been contracted as

23  FRs, and thus were entitled to minimum wage and overtime pay.  UF 7.  Yang filed his consent to

24  join the putative FLSA collective action on July 2, 2009.  UF 8.  Accordingly, the statute of

25  limitations on Yang's claim under the FLSA can reach back at most to July 3, 2006 (and even

26  then only if Yang can prove a willful violation).  29 U.S.C. § 255 (providing that a cause of action

27  arising out of a willful violation may be commenced within three years after the cause of action

28  accrued).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                        11                Case No. 09 CV 1373 DMS (RBB)
                                                                        P&As ISO Motion for Summary Judgment

## IV.  **LEGAL STANDARD**

Summary judgment is appropriate if there is "no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under this standard, a moving party may shift the burden of producing evidence to the non-moving party by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (same)

Once the burden has shifted, the party opposing a properly supported motion for summary judgment cannot rest upon the mere allegations or denials in pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Simply, "summary judgment may be appropriate even if germane facts are contested, where the non-movant fails to provide substantial evidence of the disputed facts." *See* Moore's Federal Practice § 56.11[6][b], 56-120.

## V.  **LEGAL ARGUMENT**

### A.   **Yang's Claim Under the FLSA Fails As a Matter of Law Because He Qualifies for the Outside Sales Exemption**[5]

---

[5] As indicated *infra*, Northwestern Mutual here moves for summary judgment solely on the basis of the outside sales exemption, and reserves the right to demonstrate that Yang's claims fail for the additional reason that, at all relevant times, he was an independent contractor and was never an "employee" of Northwestern Mutual – the only entity he has named as a defendant.  It is undisputed that the only contracts Yang had were with Worrell and Bullock, two general agents; Northwestern Mutual was not a party to those contracts.  The contracts that Yang signed specifically stated that he was an independent contractor.  He was not supervised by, and did not ever report to anyone from Northwestern Mutual.  Indeed, in over six years Yang had contact with just two individuals from Northwestern Mutual and on only one occasion – when he met them at a hotel to discuss his failure to pass certain tests necessary for him to become authorized under FINRA regulations to sell securities-based investment products.  Without any legally relevant nexus of any kind to Northwestern Mutual, Yang simply cannot be its employee.  Accordingly, the FLSA does not apply.  *See, e.g., Sofranko v. Northwestern Mutual Life Ins. Co.*, 2008 WL 145509 (W.D. Pa. Jan. 14, 2008) (granting Northwestern Mutual's motion for summary judgment on the insurance agent's FLSA claims because the agent was an independent contractor and not an employee); *Weary v. Cochran & Northwestern Mutual Life Ins. Co.*, 377 F.3d 522, 523 (6th Cir. 2004) ("[T]his Court has repeatedly held that insurance agents are independent contractors, rather than employees, in a variety of contexts.") (affirming lower court's grant of summary judgment for Northwestern because the insurance agent was an independent contractor and not a covered employee);

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                    12                    Case No. 09 CV 1373 DMS (RBB)
                                                                        P&As ISO Motion for Summary Judgment

The FLSA requires that employers pay employees a premium rate for hours worked above forty in a workweek unless they qualify for one or more specified exemptions.  29 U.S.C. § 207(a)(1).  Section 13(a)(1) of the FLSA provides an exemption from the statute's minimum wage and overtime requirements for "any employee employed . . . in the capacity of outside salesman."  *Id.* § 213(a)(1).  The DOL Regulations promulgated under the FLSA define "outside salesman" as any employee:

> (1)   Whose primary duty is:  (i) making sales within the meaning of Section 3(k) of the [FLSA]; or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2)   Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a). [6]

**1.    Courts and the DOL Have Held That Insurance Agents Like Yang Are Outside Salespeople**

Both courts and the DOL have confirmed that insurance agents such as Yang are outside salespeople for purposes of the FLSA.  In *Chenensky v. New York Life Ins. Co.*, for example, a former New York Life agent who sold life insurance, annuities, and other financial products brought an action against New York Life for violations of the FLSA.  The company moved for summary judgment, asserting, *inter alia*, that the former agent was not entitled to receive minimum wage or overtime compensation because he was exempt from the FLSA as an outside salesperson.  *Chenensky*, 2009 WL 4975237, at *7.  The court granted the insurer's motion, concluding that "the evidence plainly shows that Chenensky's primary duty at New York Life

---

*Holden v. Northwestern Mutual Financial Network*, 2009 U.S. Dist. LEXIS 15321, at *19 (E.D. Wis. Feb. 23, 2009) (granting Northwestern Mutual's summary judgment motion, because the insurance agent was an independent contractor and not an employee); *Nixon v. Northwestern Mutual Life Ins. Co.*, 58 F. Supp. 2d 1269, 1273 (D. Kan. 1999) (dismissing claims based on independent contractor relationship); *Bogan v. Northwestern Mutual Life Ins. Co.*, 606 N.Y.S.2d 775, 776 (1994) (granting summary judgment because of independent contractor status of general agents); *Pierce v. Northwestern Mutual Life Ins. Co.*, 444 F. Supp. 1098, 1104-05 (D.S.C. 1978) (granting summary judgment and confirming independent contractor status of general and District Agents).

[6] Courts also do not dispense with common sense in determining whether an employee is "selling."  For example, in a recent case involving a claim by a pharmaceutical representative who claimed he was not truly a salesperson, the court granted summary judgment for the employer, observing that "wisdom and common sense" dictates that "sometimes, society is better off when a duck, walking and talking so, can simply be treated as one."  *Baum v. Astrazeneca LP*, 605 F. Supp. 2d 669, 687 (W.D. Pa. 2009).  That observation is no less appropriate here.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                          13                    Case No. 09 CV 1373 DMS (RBB)
                                                                              P&As ISO Motion for Summary Judgment

1    was to sell insurance." *Id*. at *6.  In support of that conclusion, the court found that there was no

2    issue of disputed material fact regarding the content of the former agent's workday, since his

3    hours were spent performing the various steps of New York Life's sales model.  *Id*.  The court

4    dismissed the former agent's contention that non-sales activities such as "fact-finding" and

5    "presenting the solution" made his work administrative, finding that such work was "merely

6    incidental to consummating the deal."  *Id*.  Moreover, this argument was undermined by the

7    former agent's commission-based compensation, under which, as here, he only got paid if a sale

8    was made.  *Id*.  According to the court, efforts to advise clients and to maintain good relationships

9    with them were "simply one mark of a good salesman," as the plaintiff would not have received

10   *any* wages had he only performed such tasks.  *Id*.

11        The court in *Chenensky* also concluded that the second half of the outside sales exemption

12   test (time outside the office) was easily met.  *Id*.  The court noted that, as here, the former agent

13   attended outside functions to "troll" for business, managed his appointment calendar, worked the

14   hours he chose, and, overall, had significant discretion over the content and structure of his

15   worklife – concluding that those facts, among others, demonstrated sufficient time outside the

16   office.  *Id*.

17        The DOL Agent Letter is also directly on point, holding that insurance agents doing

18   exactly what Yang did fall within the outside sales exemption.  In the DOL Agent Letter, the

19   DOL examined the question of whether insurance agents whose primary duty is "to make sales

20   and obtain orders for life insurance and other insurance and financial products and services"

21   qualify for the outside sales exemption under Section 13(a)(1) of the FLSA.  DOL Agent Letter,

22   p. 1.  The DOL opined that the insurance agents at issue were exempt under the outside sales

23   exemption because they:

24        • make sales "directly to clients, primarily through face-to-face meetings at the clients'
           homes or places of business . . . or [at] a restaurant or club";

25        • typically "spend a majority of their time performing tasks directly related to their own
           sales activities";

26

27        • communicate with clients by telephone, direct mail, and e-mail as an adjunct to their
           in-person sales calls, and these communications occur both outside of and within their
           offices;

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                        14                    Case No. 09 CV 1373 DMS (RBB)
                                                                           P&As ISO Motion for Summary Judgment

- spend time in the office, performing such tasks as preparing for client meetings, creating and working with documents or databases related to clients or the sale of insurance, following up on applications; educating themselves or attending training on their company's products, creating marketing or promotional activities in support of their own sales activities; and conducting research to select the specific types and amounts of insurance products to recommend and sell to clients to best meet the client's needs;

- are "responsible for originating their own sales and developing their own client lists by contacting or networking with current or prospective clients and by developing and maintaining relationships with sources of leads and referrals";[7]

- make presentations at seminars and trade shows to explain products they sold and to identify and attract new clients;

- receive training regarding the company's products and sales techniques, and the regulations governing their sales activities;

- typically determine their own hours and regularly travel to see clients and prospects during the workday, and sometimes in the evening and on weekends; and

- generally enter into commission arrangements with insurance companies that govern their compensation and are paid primarily or entirely through commissions on the insurance products they sell to clients.

*Id.* pp. 1-2.

The DOL concluded that insurance agents whose job duties match the duties described above fulfill the sales requirement of the outside sales exemption because "their primary duty is to make sales and obtain orders for life insurance and other insurance and financial products and services." *Id.* p. 3.

**It is undisputed, based on Yang's own testimony, that every single one of these elements is present in this case.** Yang made sales directly to clients through face-to-face meetings at the clients' homes and places of business and at social events and other meetings. UF 42, 45, 48, 50, 51, 53, 59, 87, 89-95. He did so extensively throughout the states of North Carolina and Georgia. Yang admitted he spent the majority of his time performing tasks directly related to his own sales activities, both in connection with the sales themselves and in his preparatory sales activities. UF 35-37.[8] Yang communicated with clients by telephone, direct

---

[7] The DOL noted that this task may entail in-person calls on clients or attendance at social functions, or making presentations (perhaps regarding their new products) at seminars, trade gatherings, or meetings of civic or non-profit organizations.

[8] The DOL was careful to clarify that the performance of activities such as calling, e-mailing, or meeting with clients at the employer's place of business does not disqualify insurance sales agents from the outside

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                                    15                         Case No. 09 CV 1373 DMS (RBB)
                                                                                              P&As ISO Motion for Summary Judgment

1    mail, and e-mail as an adjunct to his in-person sales calls, and these communications occurred

2    both outside of and within the offices with which he was affiliated.  UF 64-67.  Yang spent time

3    in the office preparing for client meetings, following up on applications, educating himself on

4    company products, and determining the specific types and amounts of insurance products to

5    recommend and sell to his clients.  Yang clearly originated his own sales and developed his own

6    client lists by contacting or networking with current or prospective clients and by developing and

7    maintaining relationships with sources of leads and referrals.  UF 40, 43-54, 57-59, 64-69, 85.

8    Indeed, as Yang noted, he was given few if any leads.  UF 75.  Yang made presentations to

9    explain the products he sold and to identify and attract new clients.  UF 76.  He received sales

10   training regarding the company's products and sales techniques, and the regulations governing his

11   sales activities.  UF 77.  He determined his own schedule and appointments and regularly traveled

12   to see his clients and prospects during the workday, in the evening and on weekends.  UF 86-90,

13   96-99, 102-105.  Finally, he entered into a commission arrangement that governed his

14   compensation and he was paid primarily or entirely through commissions on the insurance

15   products he sold.  UF 30-33.  There is not a single factor which the DOL indicated was indicative

16   of a primary duty of outside sales that is not present as to Yang.

17        The DOL further held that whether an employee satisfies the second prong of the

18   exemption – time spent away from the office – "depends on the extent to which they engage in

19   sales or solicitations, or related activities, outside of the employer's place or places of business."

20   DOL Agent Letter, p. 3.  The DOL held that this requirement would be fulfilled where the agent

21   "me[t] clients face-to-face outside of the employer's place of business in order to initiate sales,

22   such as at the client's home or business or at a restaurant or club."  *Id.*  The DOL noted that the

23   frequency of outside sales activities must be "normally and recurrently performed every

24   workweek" and "does not include isolated or one-time tasks."  *Id.* (citing 29 C.F.R. § 541.701).

25   Yang also easily satisfies this facet of the DOL's analysis.  Yang spent time every week outside

26   of the office making sales.  Indeed, according to Yang's tax returns and other documents he

27

28

sales exemption.  DOL Agent Letter, p. 3.  So long as such in-office work is incidental to and in
conjunction with qualifying outside sales activity, such work is also considered exempt.  *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                    16                    Case No. 09 CV 1373 DMS (RBB)
                                                                       P&As ISO Motion for Summary Judgment

1   publicly filed, Yang spent months, if not years, on the road and/or otherwise away from the office

2   through which he was contracted to make sales.  UF 96-99, 102-109; *see also* U.S. Bureau of

3   Labor Statistics,  *Occupational Outlook Handbook*, at 1-2 (2010-11 edition) (noting that some

4   independent agents "may spend much of their time traveling to meet with clients, close sales, or

5   investigate claims").

6        To Northwestern Mutual's knowledge, **no court** has found any insurance agent with facts

7   similar to those of Yang to be a non-exempt employee entitled to minimum wage or overtime

8   under the FLSA.  Rather, as noted above, the DOL and courts have found the exact opposite.

9        **2.      Uncontroverted Facts Establish That Yang's Primary Duty Was the
              Sale of Life Insurance**

10       DOL Regulations define an employee's "primary duty" as the "principal, main, major, or

11  most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Courts determine an

12  employee's primary duty based on "all the facts in a particular case, with the major emphasis on

13  the character of the employee's job as a whole" and the relationship of exempt to non-exempt

14  duties and how essential they are to an employee's job.  *Id.*; *see also Gregory v. First Title of

15  Am., Inc.*, 555 F.3d 1300, 1302-03 (11th Cir. 2009) (holding that a marketing executive qualified

16  as exempt under the outside sales exemption where her primary duty was to persuade clients to

17  place orders with title insurance company and her compensation was tied to how many orders she

18  obtained); *Hodgson v. Krispy Kreme Doughnut Co.*, 346 F. Supp. 1102, 1103 (M.D.N.C. 1972)

19  (considering all facets of driver-salesmen's duties in determining they were properly classified as

20  exempt under the outside sales exemption).  The FLSA defines "sale" and "sell" broadly to

21  include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other

22  disposition."  29 U.S.C. § 203(k); s*ee also* 29 C.F.R. § 541.501.  Exempt sales work also includes

23  all "work performed incidental to and in conjunction with the employee's own outside sales or

24  solicitations."  29 C.F.R. § 541.500(b).  There can be no question here that Yang's activities were

25  all part of making a sale, or, at the very least, were incidental to or in conjunction with his own

26  sales activity.

27       **a.      Yang Admits That His Job Was Selling, and He Had No Other
              Duties**

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                    17                Case No. 09 CV 1373 DMS (RBB)
                                                                    P&As ISO Motion for Summary Judgment

The undisputed facts demonstrate beyond any doubt that Yang's primary duty was "selling."  Yang concedes that he sold life insurance, and his compensation was derived 100% from his sales.  UF 9-83.  Yang's testimony establishes that he always conceived of his work while appointed as a FR with Worrell and Bullock as selling.  UF 12, 14, 34.  Yang conceded that he sold Northwestern Mutual's insurance products, and remained a salesperson throughout the time he sold those products.  UF 13-14.  He directed his work activities – from prospecting for clients to meeting with customers – toward closing sales.  UF 38-41.  Yang concedes that he went to Georgia to develop and open a new Korean sales market.  UF 19.  He saw "hundreds of people" and "sold" products to those customers:

> Q.  When was the first time you were in Georgia meeting with a policyholder over a contract?
>
> A.  I have no idea.  There's no way I can remember that.  **I see, you know, hundreds of people.**  There's no way – and I had been there almost six years.  There is no way I'm going to remember.  I don't even remember all of my clients' names right now.
>
> **I sold** to Koreans, Japanese, Americans, African-Americans, Middle Eastern.  **I sold them all.**  There is no way I can remember who, who my first, I don't even know who my first customer was with Northwestern, period.

UF 39 (emphasis added).

Most indicative that selling was Yang's primary duty is that his sole source of income was tied directly to his sales.  UF 30-33.  Yang received no commission unless he closed a sale or from renewals of the insurance he sold.  UF 30-31; *see, e.g.*, *Holden v. Northwestern Mutual Financial Network*, 2009 U.S. Dist. LEXIS 15321, at *13 (E.D. Wis. 2009) (noting that the commissions of Northwestern Mutual insurance agents come from "the <u>sale</u> of various insurance and securities products") (emphasis added).  Moreover, Yang's testimony shows that he conceived (and still conceives) of sales as his primary duty when he was contracted with Worrell and Bullock, since he concedes that sales is his primary and only duty in his current work at MassMutual and his work at Northwestern Mutual was the same.  UF 25-29, 34; *see also* UF 24 (Yang's résumé identifying his work while contracted with Worrell and Bullock as "Professional Sales Experience").

Finally, Yang admitted that he did not have any duties other than sales.  UF 78 ("Q. Okay.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2

18

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

1   Other than selling insurance, training people sometimes to learn how to sell insurance, any other

2   duties of any kind that you were asked to perform while you were contracted to Mr. Worrell or

3   Mr. Bullock? A. I have no idea.  I don't know.  Q. You don't remember any?  A. No.  As far as I

4   know – as far as I know, no.")  To that end, unlike certain cases in which insurance agents have

5   claimed their duties were administrative (and not sales) because, as registered representatives,

6   their primary duty involved providing advice and counsel to clients on the best possible

7   investment alternatives, Yang was <u>not</u> even a registered representative because he could not pass

8   the tests that would have enabled him to sell securities.  UF 15, 79.  Thus, Yang's sole focus was

9   to sell life insurance.  He had no other duties.

10  Accordingly, as a matter of law, Yang cannot show that selling was not his primary duty.[9]

11  **b.      Yang Satisfies All Indicia of Having Sales As His Primary Duty**

12  Courts also consider traditional indicia in assessing whether an individual's primary duty

13  was selling, including whether the job was advertised as a sales position, whether the employee

14  was recruited based on sales experience and abilities, whether the employee was hired and treated

15  as a salesperson, whether the employee received sales training, whether the employee

16  independently solicited new business, whether the employee's compensation was based wholly or

17  in significant part on commissions, and whether the employee received direct or constant

18  supervision in carrying out daily work tasks.  *Nielsen v. Devry, Inc.*, 302 F. Supp. 2d 747, 756-58

19  (W.D. Mich. 2003); *In re Novartis Wage & Hour Litig.*, 593 F. Supp. 2d 637, 648-52 (S.D.N.Y.

20  2009); *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 550 (E.D. Mich. 2004); *Fields v.

21  AOL Time Warner, Inc.*, 261 F. Supp. 2d 971, 974 (W.D. Tenn. 2003).  Applying these indicia,

22  the uncontroverted facts here compel the conclusion on every one of these factors that Yang was,

23  and still is, an outside salesman.

24  Yang was recruited to sell because of his vast years of prior sales experience, and he was

25  told upon signing his contract that his job was sales.  UF 12.  He referred to his position

---

26  [9] Yang has made much of the fact that he had to spend a significant amount of time studying to pass the

27  tests which are required by the Financial Industry Regulatory Authority to become a registered
    representative.  However, it is an indisputable fact that the purpose of passing those tests and being

28  licensed to sell securities is to sell other products, making his studying for the tests "[o]ther work that
    furthers the employee's sales efforts," and which is itself exempt sales work.  29 C.F.R. § 541.500(b).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

1   repeatedly as sales.  UF 17, 19, 39-41.  Yang was provided with sales training and sales training

2   materials through his general agents that he could utilize if he so chose.  UF 77, 80;[10] *see also*

3   *Hodgson*, 346 F. Supp. at 1103 (applying outside sales exemption to individuals who received

4   sales training on, inter alia, how to increase sales and gain new business).  Yang had to have

5   specific licenses to sell insurance.  UF 82.  Yang was required to meet minimum selling

6   standards.[11]  UF 83 (Complaint ¶ 15, stating that "the Company imposes strict <u>sales</u>

7   <u>requirements</u>" (emphasis added)).  Yang devoted his time and effort to sales and sales-related

8   activities such as meeting with clients, developing leads, developing relationships with groups

9   and organizations, and dropping-in on business owners.  UF 42-59.  The fact that these activities

10   regularly required extensive travel (often to places located hundreds of miles from the office)

11   underscores that they must have consumed a great deal of Yang's time.

12       Yang was also subject to only the loosest supervision, if any, with respect to his daily

13   sales activities.  Yang's testimony establishes that he chose which products to sell, he scheduled

14   his own appointments, he built his own client base, and he originated his own sales.  UF 60-67.

15   Yang also made such independent decisions as pursuing sales outside of Worrell's territory and

16   purchasing advertising, even where he had to bear some or all of the cost of these activities

17   himself.  UF 68-69.

18       Finally, Yang's compensation was primarily or solely based on commission.  UF 30-33

19   (Complaint ¶ 15, stating that "Reps receive no base salary at all – working exclusively on a

20   commission basis").  Indeed, like the pay of the former insurance sales agents in *Chenensky*,

21   Yang's commissions came only from his **<u>own</u>** sales, and <u>not</u> from the sales of any other party.

22   *Chenensky*, 2009 WL 4975237, at *6 (under agent's commission-based compensation system he

23   only got paid if a sale was made); *see also Schmidt v. Eagle Waste & Recycling, Inc.*, 598 F.

24   Supp. 2d 928, 936 (W.D. Wisc. 2009) (holding that sales duties were the most important because

---

[10] There can be no question that the training Yang received was sales training.  As Yang and his co-plaintiffs admitted, the training involved the "Granum" sales principles, a sales system devised by O. Alfred Granum.  The system uses a 10/3/1 ratio where agents try to make 10 contacts with 10 potential customers, and try to make and keep 3 sales appointments, to make 1 sale.  UF 81.

[11] Being required to meet minimum sales standards is a further clear indicator of being a salesman.  *Fields*, 261 F. Supp. 2d at 974-75 (being required to meet minimum standards suggests that selling is the individual's primary duty).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                    20                    Case No. 09 CV 1373 DMS (RBB)
                                                        P&As ISO Motion for Summary Judgment

1    they had a direct impact on compensation); DOL Agent Letter, p. 2 (concluding that the insurance

2    agents at issue, who are "paid primarily or entirely through commissions on the insurance

3    products they sell to clients," are within the outside salesman exemption).  Accordingly, as with

4    the insurance agents in *Chenensky* and in the DOL Agent Letter, the structure of Yang's

5    compensation is a strong indicator that he qualifies for the outside sales exemption.  *See Nielsen*,

6    302 F. Supp. 2d at 757-58 (an individual paid wholly or largely on a commission basis is more

7    likely to be primarily engaged in sales work).  Having admitted that (1) he made sales, (2) his sole

8    source of income from Worrell and Bullock was from those sales, and (3) he generated

9    commissions only from purchases made by his clients, Yang, as a matter of law, cannot say that

10   selling was not his primary duty.

11                    **c.        Work Performed "Incidental to and in Conjunction with" an
                               Individual's Outside Sales Is Also Exempt Work That Counts
12                             Towards Determining an Individual's Primary Duty**

13                    The DOL Regulations are also clear that the outside sales exemption does not require that

14   all of an employee's work be actually making sales.  Indeed, in addition to the work of soliciting,

15   making, and closing sales, all "work performed ***incidental to and in conjunction with*** the

16   employee's own outside sales or solicitations," regardless of where performed, is exempt work

17   and may be counted in determining whether the employee's primary duty is outside sales.  29

18   C.F.R. § 541.500(b) (emphasis added).  For example, work such as "attending sales conferences,"

19   preparing paperwork related to the employees sales, and promotional activities directed toward

20   the consummation of the employee's own sales or solicitations is also considered exempt work.

21   *Id.* §§ 541.500(b), 541.503(b).  Accordingly, to the extent Yang argues that any of his tasks do

22   not constitute sales or solicitation in and of themselves, they are certainly "incidental to and in

23   conjunction with" his sales activities within the meaning of the FLSA.  *See*, *e.g.*, *Ackerman v.*

24   *Coca-Cola Enter., Inc.*, 179 F.3d 1260, 1266 (10th Cir. 1999) (concluding that work salesmen

25   performed in support of their sales was incidental to those sales and that plaintiffs were therefore

26   exempt from the FLSA); *Olivo*, 374 F. Supp. 2d at 550 (concluding that time plaintiffs spent at

27   the office, including "following up on contacts and leads generated during outside sales visits,"

28   was incidental to plaintiffs' outside sales efforts); *Clausman v. Nortel Networks, Inc.*, 2003 U.S.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                                21

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

Dist. LEXIS 11501, at *11-*12 (S.D. Ind. May 1, 2003) (stating that the court would have to ask every potential plaintiff in a putative FLSA collective action "precisely what each individual did" while in the office, and whether such work was incidental to his outside sales).

### 3.   Uncontroverted Facts Establish That Yang Was Customarily and Regularly Engaged Away from the Office Selling Life Insurance

Turning to the second prong of the FLSA's outside sales exemption, the DOL Regulations provide guidance as to what it means to be "customarily and regularly engaged away from the employer's place of business."  The Regulations explain that "[t]he phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.701.  The regulations further indicate that "[t]he outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home." *Id.* § 541.502.  Although not a part of its Regulations, the DOL recently explained in its home sales employee Opinion Letter that selling or sales related activities that occurred outside the employer's office "one or two hours a day, one or two days a week" was sufficient to meet the requirement of being customarily and regularly engaged away from the employer's business. *See* DOL Opinion Letter FLSA 2007-2, p. 4; *see also Schmidt*, 598 F. Supp. 2d at 936-37 (holding that employee whose duties included contacting potential customers, convincing them to use company's disposal services, negotiating prices, and providing service qualified for outside sales exemption); *Ackerman*, 179 F.3d at 1267 (holding that employees who spent 20-65% of their workweek in the office promoting the defendant's products were still exempt outside salespeople, because their in-office activities were incidental to outside sales efforts).

Yang's own testimony is that he spent *at least* 10-20% of his time outside the office in meetings with current and prospective clients.  UF 84.  That admission alone satisfies the requirement of being outside of the office on a basis "greater than occasional." 29 C.F.R. § 541.701.

Putting aside Yang's dispositive admission, the uncontroverted facts also demonstrate beyond any doubt that Yang was "customarily and regularly" engaged away from the office with

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2

22

Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

1   which he was affiliated in performing his sales and sales related activity.  UF 84-109.  Indeed,

2   Yang's normal and recurring outside sales activities mesh perfectly with the sort of outside

3   activities described in the DOL Agent Letter and *Chenensky*.

4       As detailed in a recorded presentation he gave at a regional sales meeting, Yang would see

5   40 clients on Tuesdays and Thursdays, and 10 clients on Mondays and Wednesdays.  UF 9.  To

6   see those 50 clients Yang would put 4,000 miles on his car every month.  UF 9, 97.  Yang worked

7   to sell and sold insurance after working hours, on weekends, and while out of the office during

8   the week.  UF 85-86.  He visited customers at their homes and places of business, regularly

9   dropping-in on them to solicit their business, deliver policies, and meet with them for a variety of

10  purposes.  UF 87-90, 93-95.  He admits to having ten or fifteen clients in Georgia and other

11  clients in South Carolina while he was still allegedly working out of the Charlotte office.  UF

12  102-108.  He would travel from North Carolina to South Carolina and Georgia to visit these

13  clients.  UF 102-108.  The fact that such routine out-of-office sales activities often required

14  extensive travel (*e.g.*, 4,000 miles per month on his car), underscores the fact that such outside

15  activities consumed massive chunks of Yang's time.[12]

16      Yang made sales directly through face-to-face meetings at clients' homes or places of

17  business or at social venues.  UF 87, 89-95.  Yang did so wherever he was, even if that was at the

18  grocery store.  UF 87.   Yang communicated with his clients by phone and e-mail, as an adjunct

19  to his in-person sales calls, and such communications occurred both outside of and from the

20  office.  UF 57-58.  Indeed, as a "24/7 person," Yang communicated with clients with his personal

21  cellular phone, regardless of whether he was inside or outside of the office, and regardless of

22  whether such communications occurred during or after working hours.  UF 64, 85-86.  For that

23  reason, Yang regularly provided his personal cellular phone number and email address to current

24

---

25  [12] The nature of Yang's sales activities makes the reality of outside sales as articulated by the Tenth Circuit
    Court of Appeals particularly instructive and timeless.  In *Jewel Tea Co. v. Williams*, 118 F.2d 202 (10th

26  Cir. 1941), the Tenth Circuit, nearly 70 years ago, reviewed the work of an outside salesman who worked
    "away from his employer's place of business, is not subject to the personal supervision of his employer,

27  and his employer has no way of knowing the number of hours he works per day."  *Id.* at 207-08.  As to
    such individuals, as with Yang, the court noted "[t]o apply hourly standards primarily devised for an

28  employee on a fixed hourly wage is incompatible with the individual character of the work of an outside
    salesman." *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2          23          Case No. 09 CV 1373 DMS (RBB)
P&As ISO Motion for Summary Judgment

1   and prospective clients.  UF 65-67.

2          Yang attended public gatherings to promote his business, including attending community

3   organization meetings and playing golf with clients.  UF 45, 48, 51, 53, 93-95.  Yang attended

4   these meetings during working hours, and after hours and on weekends.  UF 93 (attending

5   meetings with 40 local Asian business owners twice a week when he was first contracted).  Based

6   on the foregoing, Yang cannot credibly dispute that his outside sales activities were of a

7   frequency that was greater than occasional, and appear more likely to have been constant.

8   Accordingly, Yang, like the insurance agents discussed in the DOL Agent Letter and *Chenensky*,

9   was customarily and regularly engaged away from his place of businesses for purposes of the

10  outside sales exemption.

11         Given the foregoing facts and consistent legal authority holding that insurance agents in

12  circumstances such as exist here are outside salespersons, this Court should dismiss Yang's

13  claims as a matter of law.

14  **VI.    CONCLUSION**

15         For all of the foregoing reasons, Northwestern Mutual respectfully requests that this Court

16  grant its motion for summary judgment as to Yang's claims.

17

18  Dated:  July 23, 2010                              MORGAN, LEWIS & BOCKIUS LLP

19

20                                                     By:  /s/ Barbara J. Miller
                                                           Barbara J. Miller

21

22                                                     Attorneys for Defendant
                                                       NORTHWESTERN MUTUAL LIFE
23                                                     INSURANCE COMPANY

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB1/65265596.2                          24           Case No. 09 CV 1373 DMS (RBB)
                                                     P&As ISO Motion for Summary Judgment